**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JOSEPH HARVEY BROOKS,
*Defendant-Appellant*.

No. 12-30264

D.C. No.
3:11-cr-00074-HA-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, Senior District Judge, Presiding

Argued and Submitted
February 5, 2014—Seattle, Washington

Filed May 7, 2014

Before: Raymond C. Fisher, Ronald M. Gould,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## Criminal Law

The panel vacated the district court's order authorizing involuntary medication in order to render the defendant competent to stand trial, in a case in which the parties agree that remand is necessary so that specific time limitations may be added to the involuntary-medication order.

The panel held that the district court did not clearly err in determining that the defendant suffered from a mental illness.

Because over a year has passed since the district court's order was entered, the panel believed that a new inquiry pursuant to *Sell v. United States* is required, and took the opportunity to provide additional guidance concerning the procedures to be followed on remand. The panel instructed the district court to make a specific determination that no other basis for forcibly administering medication is reasonably available before conducting a new *Sell* analysis.

Regarding the *Sell* requirement that important governmental interests must be at stake, the panel wrote that the district court must consider, on the one hand, the potential for and anticipated length of future civil commitment in the event the defendant is not medicated and the amount of time the defendant has already been confined, versus the period of confinement that could reasonably be expected if the defendant were restored to competency and convicted of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

charged offense. The panel wrote that the district court should also consider any other significant factors that could strengthen or weaken the governmental interests in prosecuting the defendant, including the extent to which delaying the prosecution could jeopardize the government's position at trial.

## COUNSEL

C. Renée Manes (argued), Assistant Federal Public Defender, Office of the Federal Public Defender, Portland, Oregon, for Defendant-Appellant.

Stephen F. Peifer (argued), Assistant United States Attorney, S. Amanda Marshall, United States Attorney, Kelly A. Zusman, Appellate Chief, Office of the United States Attorney, Portland, Oregon, for Plaintiff-Appellee.

## OPINION

CHRISTEN, Circuit Judge:

Among the most weighty decisions our society can make is to subject someone to a powerful medication against his or her will. The government must meet the demanding standard set by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), before involuntary medication may be administered in an effort to restore a defendant's competency to stand trial. This case requires that we consider whether the district court appropriately authorized involuntary medication in order to render Joseph Brooks competent to stand trial for arson. Brooks and the government agree that remand is

necessary so that specific time limitations may be added to the district court's order authorizing involuntary medication. Because over a year has passed since the district court's order was entered, we believe a new *Sell* inquiry is required, and we take this opportunity to provide additional guidance concerning the procedures to be followed on remand.

## BACKGROUND

Joseph Harvey Brooks, age 53, has a lengthy history of mental health issues including paranoid schizophrenia. This is not the first time a government entity has sought to medicate Brooks against his will. After he was charged with assault in 2004, Brooks underwent several forensic evaluations of his mental health. In 2004 and 2005, he was hospitalized to restore his competency to stand trial for assault. During this period, a Washington state court authorized a hospital to treat Brooks with antipsychotic medications if necessary, and he received such medications.

The current appeal relates to a different incident. The government alleges that Brooks attempted to set fire to cables connecting a radio antenna on a roof at Oregon Health Sciences University. Brooks was indicted for arson in federal district court in 2011. After reviewing Brooks's forensic mental health evaluations, the district court found Brooks mentally incompetent to stand trial and ordered his hospitalization pursuant to 18 U.S.C. § 4241(d)(1).[1] On

---

[1] Under 18 U.S.C. § 4241(d)(1), a federal court may hospitalize a mentally incompetent defendant "for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."

December 16, 2011, Brooks was admitted to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri.

An internal administrative hearing pursuant to 28 C.F.R. § 549.43 was held on March 5, 2012 at the federal medical facility to determine if Brooks met the criteria for involuntary administration of antipsychotic medication for reasons such as grave disability or because he posed a danger to himself or to others at the facility.[2] This proceeding is referred to as a *Harper* hearing.[3] *See Washington v. Harper*, 494 U.S. 210 (1990). The hearing officer determined that Brooks did not meet the *Harper* criteria, and he was not involuntarily medicated.

The government then filed a motion seeking court approval to medicate Brooks with antipsychotic drugs against his will so that he would regain competency to stand trial, pursuant to the Supreme Court's decision in *Sell*. 539 U.S. at 177–83. In *Sell*, the Court reaffirmed that "an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Id.* at 178 (citation and internal quotation marks omitted). *Sell* also held that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial," but only if a court determines that four conditions are met. *Id.* at 179. These conditions, which we refer to as the "*Sell*

---

[2] The procedures that must be followed before medication may be involuntarily administered to an inmate are outlined in 28 C.F.R. § 549.46.

[3] At oral argument for this appeal, the government agreed that the March 5, 2012 internal administrative hearing was a *Harper* hearing.

factors," are that: (1) there are "*important* governmental interests" at stake; (2) "involuntary medication will *significantly further* those concomitant state interests;" (3) "involuntary medication is *necessary* to further those interests;" and (4) "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id.* at 179–81.

Under *Sell*, before a court orders involuntary medication for purposes of restoring competency to stand trial, the court must determine "whether the Government seeks, or has first sought, permission for forced administration of drugs on . . . other, *Harper*-type grounds; and, if not, why not." *Id.* at 183.[4]

The *Sell* standard for involuntary medication is "more demanding" than the *Harper* standard.[5]  *United States v. Loughner*, 672 F.3d 731, 747 (9th Cir. 2012).  *Sell* inquiries are "disfavored," *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005), in part because they are less "objective and manageable" than *Harper* inquiries, *id.* (quoting *Sell*, 539 U.S. at 182).  We have explained that,

---

[4] Accordingly, our court has held that "prior to undertaking the *Sell* inquiry, a district court should make a specific determination on the record that no other basis for forcibly administering medication is reasonably available," and that "[i]f a district court does not conduct a dangerousness inquiry under *Harper*, it should state for the record why it is not doing so." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 914 (9th Cir. 2007).

[5] *Harper* held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227; *see Sell*, 539 U.S. at 178.

under *Harper*, "an inmate . . . is being treated for reasons that are in his and the institution's best interests," while under *Sell*, "the inmate is being treated because of the *government's* trial interests, not the prison's interests or the inmate's medical interests." *Loughner*, 672 F.3d at 758–59. Put another way, the *Harper* inquiry determines whether medication may be involuntarily administered "to render an individual nondangerous" during confinement, while a *Sell* inquiry asks whether medication is necessary to allow the government to prosecute the individual. *Id.* at 747.

In this case, on August 7, 2012, the district court held a *Sell* hearing on the government's motion for involuntary medication. Brooks testified that a "Ku Klux Klan Mafia mob organization" was trying to murder him, as foretold in the Biblical Book of Revelations. He claimed that a contract to kill him had been put out by the "kingpin" of the Ku Klux Klan—allegedly "the owner manager of the Riverside Motel in Vancouver, Washington." He stated "I am not a violent person," and "I'm not psychotic or delusional." In response to the court's questioning, he indicated his willingness to take medications "as a last resort . . . until I get some appropriate help from law enforcement" in fighting the Ku Klux Klan mafia. But later in the hearing, referring to the Ku Klux Klan or mafia conspiracy against him, he stated: "I don't need no medication to stop something that ain't gonna be stopped by medication."

The court also heard testimony from Dr. Robert Sarrazin, Brooks's treating physician and the chief of psychiatry at the Federal Medical Center in Springfield, Missouri. Dr. Sarrazin testified that he had been involved in over fifty *Sell* hearings. He stated that Brooks had been diagnosed with paranoid schizophrenia, was "clearly . . . delusional" as

evidenced by his false beliefs regarding the mafia, and that absent treatment with antipsychotic medications he "will not become competent in the foreseeable future." At the time of the *Sell* hearing, Dr. Sarrazin testified that Brooks's mental illness had been ongoing for more than a year. In fact, from medical records it appears that he has been mentally ill for around a decade or longer.

Dr. Sarrazin opined that it was "substantially likely that Mr. Brooks will be restored to competency in the foreseeable future with treatment with antipsychotic medications." Dr. Sarrazin testified that similarly situated prisoners have been "restored to competency over 70 percent of the time." Because Brooks "ha[d] no insight into his illness" and "was quite insistent that he has no mental illness and needs no treatment," Dr. Sarrazin indicated that there was no reason to believe he would consent to voluntary medication. According to Dr. Sarrazin, medication was a "necessary treatment" and the least intrusive treatment likely to achieve success. He also concluded that there was nothing about Brooks's physical condition that would render medication inappropriate.

Based on its consideration of the sealed record and the evidence presented at the *Sell* hearing held on August 7, 2012, the district court granted the government's motion for authorization to medicate Brooks involuntarily. The court found that each of the *Sell* requirements was met. Its written order did not expressly explain how the government had established the first prong of the *Sell* test, that important governmental interests are at stake. At the hearing, however, the court told Brooks: "For the record, I will find that the governmental interests in this case are high from the standpoint that if, in fact, you were not in custody, there's a

likelihood that you would, in fact, cause harm to the members of the public or property." The written *Sell* order authorized the Federal Bureau of Prisons to administer one or more antipsychotic medications at specified dosages but did not include a time limitation. The court authorized Brooks's continued commitment pursuant to 18 U.S.C. § 4241(d)(2)(A)[6] "until further order of the court to set another hearing to assess the status of defendant's treatment and to determine whether defendant may be returned to the District of Oregon to participate in further proceedings."

Brooks appealed to this court. The district court stayed the involuntary medication order pending this appeal.

## DISCUSSION

"Ordinarily, an appellate court may hear appeals only from a district court's final decision." *Loughner*, 672 F.3d at 742 (citing 28 U.S.C. § 1291). Here, we have jurisdiction to review the district court's involuntary medication order under the collateral order doctrine. *Id.* at 743; *see also Sell*, 539 U.S. at 177 (holding that district court's involuntary medication order was an appealable collateral order). This court has held "that the first *Sell* factor . . . is a legal question subject to *de novo* review, and that the remaining *Sell* factors are factual questions . . . reviewed for clear error." *Hernandez-Vasquez*, 513 F.3d at 915–16.

---

[6] This provision authorizes the Attorney General to hospitalize a defendant for treatment in a suitable facility for a reasonable period of time "if the court finds that there is a substantial probability that within such . . . period of time he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(2).

## I.  The Defendant's Mental Incompetency

Brooks argues there is no need for involuntary medication to restore him to competency because he is not mentally ill. Brooks's mental condition is a factual question, and the district court's determination that Brooks is mentally ill is reviewed for clear error.  *Id.*

Brooks's statements at the hearing, the testimony of Dr. Sarrazin, and the sealed forensic reports and evaluations included in the record provide ample support for the district court's finding that Brooks suffered from a mental illness at the time of the hearing.  In particular, multiple psychiatrists diagnosed Brooks with delusions and paranoid schizophrenia, and Brooks's statements at the hearing regarding the Ku Klux Klan and the mafia were consistent with these diagnoses. The district court did not clearly err in determining that Brooks suffered from a mental illness.

## II.  Consideration of Alternative Grounds for Involuntary Medication

It appears that the district court reasonably concluded there was no other basis for forcibly administering medication because of the outcome of the March 5, 2012 *Harper* hearing; neither party contends otherwise.  Given the amount of time that has passed since the district court's *Sell* order, on remand the district court should make a specific determination that no other basis for forcibly administering medication is reasonably available before conducting a new *Sell* analysis.  The district court is not required to order or conduct a new *Harper* hearing if one is not otherwise indicated, but if the court does not conduct a dangerousness

inquiry, "it should state for the record why it is not doing so." *Id.* at 914.

## III.     Governmental Interests in Involuntary Medication

Of the four *Sell* factors, Brooks only specifically challenges the district court's determination of the first factor, the requirement that important governmental interests must be at stake. Our review of this legal question is de novo. *Id.* at 915–16. Brooks argues that the government's interest is in public safety and that involuntary medication is unnecessary to serve this interest because, absent medication, he will remain confined pursuant to 18 U.S.C. § 4246. This provision states that a district court may order the continued hospitalization of:

> a person in the custody of the Bureau of Prisons . . . who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person [if the person] is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another.

18 U.S.C. § 4246(a).

Brooks claims that if he were restored to competency, "he would present the defense that he was not guilty by reason of insanity." His argument, in essence, is that he was so clearly incompetent at the time of the underlying offense that the

government has no independent interest in prosecution except to keep him confined, which will be accomplished whether or not he is prosecuted and convicted.  *See Clark v. Arizona*, 548 U.S. 735, 768–69 (2006) ("'A central significance of the insanity defense . . . is the separation of nonblameworthy from blameworthy offenders.'" (quoting D. Hermann, *The Insanity Defense: Philosophical, Historical and Legal Perspectives* 4 (1983))).  Brooks argues that the government's interest in public safety may be adequately served by civil commitment under 18 U.S.C. § 4246(a), which allows the government to involuntarily hospitalize him so long as he remains "a substantial risk of bodily injury to another person or serious damage to property of another."

As a threshold matter, we reject Brooks's premise that the district court is required to speculate about whether Brooks would be found not guilty by reason of insanity if he pursued that defense.  We also decline to analyze the first *Sell* factor as applied to Brooks's case.  Brooks's contention that the district court did not adequately address this factor is well-taken.  But this is a fact-intensive analysis that the district court is better suited to conduct in the first instance, especially where, as here, the relevant considerations may have changed with the passage of time.  Instead, we summarize below the Supreme Court and circuit authority addressing the first *Sell* factor, and remand to the district court to address Brooks's argument when it conducts a new *Sell* inquiry.  Given that more than a year has passed since the district court's initial *Sell* hearing, the court should also ascertain whether there have been significant changes in Brooks's mental and medical condition or in the relevant standard of care for treatment aimed at restoring competency.

To evaluate the first *Sell* factor, the district court should begin by considering "the seriousness of the underlying crime." *Hernandez-Vasquez*, 513 F.3d at 915; *see United States v. Gillenwater*, No. 12-30379, 2014 WL 1394960, at *4 (9th Cir. Apr. 11, 2014). *Hernandez-Vasquez* provides guidance on how to analyze this question. 513 F.3d at 917–19. There, we held that the penalty for which the defendant could be liable if convicted is a relevant factor, and therefore "the likely guideline range is the appropriate starting point for the analysis of a crime's seriousness." *Id.* at 919. But the guideline range is the beginning of the analysis, not the end. The Supreme Court has directed that "courts must consider the facts of individual cases in evaluating the government's interest in prosecution." *Id.* at 918; *see also Sell*, 539 U.S. at 180; *Gillenwater*, 2014 WL 1394960, at *4. "Such relevant circumstances include the time a defendant has served while awaiting trial and the possibility of future civil confinement." *Hernandez-Vasquez*, 513 F.3d at 918 (citing *Sell*, 539 U.S. at 180).

In *Sell*, the Supreme Court acknowledged that "[s]pecial circumstances may lessen the importance" of the governmental interests in prosecution. *Sell*, 539 U.S. at 180. In particular, "[t]he defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* The Court went on:

> We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or

impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

*Id.*[7]

From this discussion of the first factor in *Sell*, we glean the principle that the district court must consider, on the one hand, the potential for and anticipated length of future civil commitment in the event the defendant is not medicated and the amount of time the defendant has already been confined, versus the period of confinement that could reasonably be expected if the defendant were restored to competency and convicted of the charged offense. The district court should also consider any other significant factors that could

---

[7] The governmental interest in a fair trial is implicated by both the first and second *Sell* factors. Under the second *Sell* factor, a court "must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181. An individual defendant's past responses to antipsychotic medications, if any, will bear upon the likelihood and severity of side effects.

strengthen or weaken the governmental interests in prosecuting Brooks, including the extent to which delaying the prosecution could jeopardize the government's position at trial. It is not clear from the record that the district court conducted this inquiry. Where the district court has yet to explore all the facts relevant to the first *Sell* factor, we decline to create additional rules or guidance beyond what has been expressed through binding authority. We have confidence in the district court's ability to weigh these considerations in the first instance, and we believe it is in the best position to do so.

## IV.    Time Limitations on Involuntary Medication

A *Sell* order must identify "the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress." *Hernandez-Vasquez*, 513 F.3d at 917. The parties agree that the district court's order did not specify the time limitation. Remand is necessary on this issue.

## CONCLUSION

Given that remand is necessary, a new *Sell* inquiry is required because of the amount of time that has passed since the district court's order was entered. If the district court determines on remand that no alternative basis for forcibly medicating Brooks is indicated, it should proceed to consider all four *Sell* factors anew.

**VACATED AND REMANDED.**